**FIELD ENTERPRISES, INC.**
v.
**The UNITED STATES.**
No. 13–60.

United States Court of Claims.
July 16, 1965.

James B. Lewis, New York City, for plaintiff, Alan N. Cohen, Richard H. Paul, Michael J. Nassau, and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel.

David D. Rosenstein, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant, C. Moxley Featherston, Lyle M. Turner, and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COLLINS, Judge.

In this action, plaintiff seeks the refund of alleged overpayments of income tax for its fiscal years which ended September 30, 1955, and September 30, 1956, respectively. The total of the alleged overpayments (including interest) is $476,037.65.

Among plaintiff's business activities were the publication and sale of the World Book Encyclopedia.[1] Marketing was accomplished by plaintiff's vast sales organization which relied upon personal solicitation. More than 80 percent of the purchases were made under the installment plan.

This case arises out of a dispute between plaintiff, an accrual-basis taxpayer, and the Commissioner of Internal Revenue over the proper year for the deduction of "quality bonuses," a portion of the compensation paid to plaintiff's sales managers. Effective October 1, 1954 (the beginning of plaintiff's 1955 fiscal year), plaintiff altered its system for compensating sales personnel. Previous to October 1, 1954, all of plaintiff's sales force, managers as well as salesmen, were paid by means of commissions.[2] However, the revised system introduced a new element, the "quality bonus," which managers[3] would receive in addition to specified commissions. There is no dispute as to plaintiff's tax treatment

---

1. Another set of books published and sold by plaintiff was Childcraft. The legal issues regarding World Book and Childcraft are the same. For the sake of brevity, the examples and references in this opinion will be limited to World Book.

2. For a detailed discussion of the former (i. e., pre-October 1954) system and

plaintiff's method of accounting therefor, see findings 14–16.

3. Actually, plaintiff had several levels of managers. Finding 6(b). Although the amount of compensation varied from level to level, the same basic principles applied to each category of managers. Finding 17.

of the commissions, but the basic issue in the present controversy is the proper time for deduction of quality bonuses.

Determination of quality bonuses was accomplished on the basis of 3-month periods. The size of the quality bonus which a particular manager would receive depended upon the number of approved orders taken in his territory which became "bona fide." The test of "bonafication" was met if the purchaser accepted delivery and paid, within 6 months, an amount equal to the down payment plus two installment payments. Findings 17(b) and 23. For each order which did not become bona fide, the manager's account would be charged an amount equal to the sum of the commissions paid to the manager and to certain of his subordinates. Thus, depending upon the number of orders which failed to become bona fide, it was possible that the charges against a manager would exceed his potential quality-bonus credits.[4] For example, with regard to a district manager, his potential quality bonus for a certain edition of World Book was $3 per set. However, for each order which did not become bona fide, a charge in the amount of $36 would be made against the manager's account. For a detailed illustration of this system, see finding 27.

With respect to each of the taxable years in issue, the amount of the quality bonus which plaintiff accrued on its books and included in its deduction for "salaries and wages" was determined in the following manner: First, plaintiff computed the total amount of potential quality bonuses which had been credited, during the year, to the accounts of the managers. Secondly, regarding the months which had ended at least 6 months prior to the close of the fiscal year, plaintiff could ascertain the exact amount of its liability for quality bonuses, since all sales made during those months either had or had not become bona fide. Thus, plaintiff knew the actual amount of charges made against the managers. Thirdly, with respect to the remaining months, it was not possible to determine plaintiff's exact liability for quality bonuses. Therefore, plaintiff, on the basis of its past experience, estimated the number of orders accepted during the latter half of the year which would, in the future, fail to become bona fide. In this way, plaintiff made an estimate of the amount which would eventually be charged against the managers. Fourthly and finally, plaintiff subtracted from the total amount of potential quality-bonus credits (1) the actual charges against the managers for the first half of the year and (2) the estimate, relating to sales made in the second half, of future charges against the managers. The resulting amount was included as a deduction on plaintiff's income tax returns. Finding 33.

Basically, plaintiff's contentions are that the deductions so determined for the respective years were proper and that plaintiff's accounting method "clearly reflected" its income.[5] The Commissioner of Internal Revenue, on the other hand, disallowed plaintiff's deductions in part, refusing to permit the deduction for quality bonuses attributable to orders taken during quality-bonus quarters which ended during the last 6 months of the fiscal year. Finding 52. The position of the Government is that plaintiff's liability for the quality bonuses was *contingent* until the "bonafication" period of 6 months had expired with respect to all orders accepted during the quarter and that, so long as such liability remained contingent, no deduction for it was proper.

The test pertaining to the proper year for deductions by an accrual-basis taxpayer is contained in Treas. Reg. § 1.461-1(a)(2) and is as follows:

Under an accrual method of accounting, an expense is deductible for the taxable year in which *all the*

4. With regard to the consequences of a deficit in a manager's quality-bonus account, see finding 28. See also findings 18 and 27(b).

5. See Int.Rev.Code of 1954, § 446.

*events have occurred which determine the fact of the liability* and the amount thereof can be determined with reasonable accuracy. * * * (Emphasis supplied.)

Cf. United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926). In the instant case, the Commissioner of Internal Revenue properly concluded that, with respect to quality bonuses attributable to sales made during a given quarter, the "all events" test was not satisfied until a period of 6 months had elapsed after the end of the quarter.

Of prime significance are the terms of the contract entered into by plaintiff and each of its managers and the corresponding practice regarding quality bonuses. The pertinent contractual provisions, which are set forth in finding 17(b), demonstrate the validity of defendant's contention that a manager had no right to a quality bonus on an individual order. Rather, entitlement to a quality bonus depended upon the experience regarding *all* orders taken in the manager's territory during a particular quarter. Upon the acceptance by plaintiff of an order, the manager received a "potential quality bonus credit." However, the credit was potential in fact as well as in name, and the credit did not represent an *actual* liability of plaintiff.

According to the contract, a manager's quality bonus was "based upon the number of accepted orders taken in * * * [his] territory which * * * [became] bona fide." Before plaintiff's obligation to pay a quality bonus came into being,

it was essential to determine the number of sales which had met the test of "bonafication," and no such determination could be made until the 6-month period had ended. As defendant points out, an integral part of the quality-bonus system was the provision that charges would be made against a manager's account for each order which failed to become bona fide.[6] The contract defined "the amount of quality bonus due * * * [a manager for a quarter]" as the "excess of credits over charges * * *." As indicated previously, it was possible that a manager's charges could be greater than his credits.

■ Plaintiff's practice regarding quality bonuses was in accord with the provisions of the managerial contracts. Clearly, the basic feature of the quality-bonus system was the matter of "bonafication." In the opinion of this court, the Commissioner of Internal Revenue properly concluded that plaintiff's liability for quality bonuses for a given quarter was not fixed until the "bonafication" period of 6 months had elapsed.

Plaintiff asserts that the fixing of its liability for a quality bonus was not deferred, but took place upon the acceptance of the order. In support of its contention, plaintiff cites a number of cases, including Ohmer Register Co. v. Com'r, 131 F.2d 682, 143 A.L.R. 1164 (6th Cir. 1942).[7] The compensation of Ohmer's sales agents included a collection commission which was payable after Ohmer received the balance of the sales price from the customer. The Commissioner

---

6. The managerial contract also provided for the possibility that charges against a manager for supplies and other expenses would be recovered from "quality bonus payments or other amounts due the manager." Finding 17(b). This provision, unlike that regarding charges for orders which did not become bona fide, was not an actual element in determining the manager's quality bonus. To the contrary, the liability for supplies, etc., was totally unrelated to the quality-bonus system.

7. Other cases cited by plaintiff with regard to the proper time for deductions

by an accrual-basis taxpayer include the following: American National Co. v. United States, 274 U.S. 99, 47 S.Ct. 520, 71 L.Ed. 946 (1927); United States v. Anderson, supra; Central Cuba Sugar Co. v. Com'r, 198 F.2d 214 (2d Cir.), cert. denied, 344 U.S. 874, 73 S.Ct. 167, 97 L.Ed. 677 (1952); Air-Way Elec. Appliance Corp. v. Guitteau, 123 F.2d 20 (6th Cir. 1941); and Warren Co. v. Com'r, 46 B.T.A. 897 (1942), acq., 1942–2 Cum.Bull. 19, aff'd regarding different issue, 135 F.2d 679 (5th Cir. 1943).

For reasons explained above, each of the decisions cited by plaintiff is materially distinguishable from the instant case.

of Internal Revenue denied the right of Ohmer, an accrual-basis taxpayer, to deduct for 1936 a "reserve" representing liability for collection commissions attributable to the sales during that year. In holding that the deduction should be permitted, the court rejected the assertion that Ohmer's liability was "contingent." The court concluded that the commissions constituted a definite obligation at the time of shipment. Since Ohmer used the accrual method, the possibility "that the agent might not, in the end receive his full commission [was] no more material than that [Ohmer] might not receive full payment * * *." 131 F.2d at 686.

According to plaintiff, the quality bonuses are analogous to the commissions involved in Ohmer Register Co., supra, but we do not agree. One factual difference is that, in Ohmer, each individual order (upon shipment) gave rise to liability for a commission. With regard to the case at bar, we have already indicated that a quality bonus was based not upon an individual sale, but upon the overall experience within the manager's territory for a given quarter. Secondly, in Ohmer and in plaintiff's other authorities, the liability regarding which deductibility was sought had become fixed in the taxable year, and this was the basis for allowing the deduction in that year. E. g., Helvering v. Russian Fin. & Constr. Corp., 77 F.2d 324, 327 (2d Cir. 1935). In other words, the "all events" test had been met, even though, in some instances, the liability was subpect to a "condition subsequent" (for example, the possibility of default by the purchaser). Cf. Central Cuba Sugar Co. v. Com'r, supra note 7, 198 F.2d at 217.

With regard to the quality bonus, our decision is not limited to a holding that *payment* of the bonus was conditional upon satisfaction of the test of "bonafication." [8] Instead, this court has concluded that no fixed liability on the part of plaintiff arose, regarding sales made in a particular quarter, until 6 months after the end of the quarter. In view of this conclusion, the notion that both sides of the ledger (i. e., income and expense) must be treated alike is not controlling. Plaintiff did accrue as income the full price of all sales made during the taxable year, subject to reduction in the amount of an addition to the reserve for bad debts. Findings 29 and 30, infra. However, because of the nature of the quality bonus, plaintiff's accrual of the income is not determinative of the issue of the proper year for deductibility.

Subsection 446(a) of the Internal Revenue Code of 1954 provides that: "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." However, one exception to the above general rule is as follows:

* * * if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary * * * does clearly reflect income. [§ 446 (b).]

The manner in which plaintiff kept its books, including plaintiff's treatment of quality bonuses, was in accord with accepted principles of accounting. Finding 56. However, a similar finding was made in American Automobile Ass'n v. United States, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961), and there the majority opinion pointed out that such a finding was not the same as a holding "that for income tax purposes it [the accounting method] so clearly reflects income as to be binding on the Treasury." 367 U.S. at 693, 81 S.Ct. at 1730.

In American Automobile Ass'n v. United States, supra, 367 U.S. at 698, 81 S.Ct. 1727, the majority of the Court upheld, as a proper exercise of discretion, the rejection by the Commissioner of Internal Revenue of the taxpayer's ac-

counting system.[9] Similarly, in the instant case, we view as the permissible exercise of discretion the Commissioner's disallowance of the deductions and his treatment of the quality bonuses. When, as here, the liability for a certain expense is not fixed in the taxable year, the Commissioner need not permit the deduction of an amount representing an estimate of that liability. Cf. Brown v. Helvering, 291 U.S. 193, 201–203, 54 S.Ct. 356, 78 L.Ed. 725 (1934).[10]

An alternative argument of defendant is that plaintiff had, without obtaining the consent of the Commissioner of Internal Revenue, made a change in its accounting for "compensation." In view of our conclusion regarding the nature of the quality bonus, discussion of defendant's alternative contention is unnecessary. However, mention must be given to the related assertion of plaintiff that the Government violated section 7605(b) of the Internal Revenue Code of 1954.[11] According to plaintiff, the inspection of plaintiff's books for fiscal 1955 which Revenue Agent Mortenson made in 1958 was illegal, since it constituted a second examination regarding that year and it had been made without written notice from the Commissioner of Internal Revenue.

The factual circumstances regarding the examination of plaintiff's records are set out in detail in findings 41–54. We will assume, for the sake of argument, that Revenue Agent Mortenson's activities amounted to an inspection of plaintiff's books for fiscal 1955. The question, then, is what consequence should attach to the failure of the Commissioner of Internal Revenue to provide plaintiff with prior written notice.

Plaintiff cites Reineman v. United States, 301 F.2d 267 (7th Cir. 1962), in which the court (1) determined that section 7605(b) had been violated and (2) held that, because of the impropriety of the second inspection, the resulting deficiency assessment was invalid.[12] In the

9. Subsequent to the decision in American Automobile Ass'n v. United States, supra, § 456 was added to the Internal Revenue Code of 1954. This section provides, in effect, that a taxpayer may elect to treat prepaid dues income in a manner like that utilized by the taxpayer in American Automobile Ass'n.

The holding of American Automobile Ass'n was followed by the majority in Schlude v. Com'r, 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963). Both of these cases involved the attempted deferral of income. See also Parkchester Beach Club Corp. v. Com'r, 335 F.2d 478 (2d Cir. 1964). However, the same principles apply to the treatment of estimated future expenses. Milwaukee & Suburban Transport Corp. v. Commissioner, 293 F.2d 628 (7th Cir. 1961), cert. denied, 368 U.S. 976, 82 S.Ct. 480, 7 L.Ed.2d 438 (1962); Simplified Tax Records, Inc., 41 T.C. 75, 79 (1963).

10. The taxpayer in Brown v. Helvering, supra, was a general agent for fire insurance companies. For each policy written, Brown received an "overriding commission." In the event of cancellation by the policyholder, Brown was required to make a refund of the overriding commission received for that policy. Brown, an accrual-basis taxpayer, deducted from accrued commissions for the year an estimate of the amount of such commissions which would be refunded in future years. The Court upheld disallowance of the deduction. 291 U.S. at 203, 54 S.Ct. 356. Until the year when cancellation occurred, the liability to make refunds was contingent.

Brown v. Helvering is relevant to the instant case, for both involve the attempted deduction of liabilities which had not become fixed.

11. Int.Rev.Code of 1954, § 7605(b), provides as follows:

"* * * No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary."

12. Also cited by plaintiff is Application of Leonardo, 208 F.Supp. 124 (N.D.Cal. 1962), an action in which the taxpayer sought to suppress the use, as the basis for criminal prosecution, of evidence obtained allegedly in violation of § 7605(b). The court granted the relief requested.

opinion of this court, there is no warrant for extending the result reached in Reineman to the present case.

Previously, this court construed a provision identical to section 7605(b). Philip Mangone Co. v. United States, 54 F.2d 168, 73 Ct.Cl. 239 (1931). The taxpayer in Mangone allowed (under protest) the reinspection of its books for the year in question. After noting that the taxpayer should have refused access to its records until proper notice was given, this court stated: "Aside from all this, however, we cannot hold that a deficiency assessment is illegal when the facts upon which it was based were ascertained in the way and manner proven." 54 F.2d at 172, 73 Ct.Cl. at 246. In addition, the opinion in Mangone quoted with approval the following language from J. S. McDonnell, 6 B.T.A. 685, 691 (1927):

* * * "However, that section of the statute [§ 1005 of the Revenue Act of 1924] merely provides for the relief from unnecessary examinations of a taxpayer's books and does not propose to provide that any deficiency resulting from such investigation shall be void." * * *

■ We consider the conclusion reached in Philip Mangone Co., supra, to be

the proper one. The facts of the present case differ from those in Mangone, but, in view of our interpretation of section 7605(b), the outcome must be the same. As indicated above, the holding in Mangone was not limited to a determination that the taxpayer had waived its rights. Cf. concurring opinion in M. O. Rife, Jr., 41 T.C. 732, 751–752 (1964).[13] At the very least, Mangone stands for the proposition that not every infraction of the notice requirement calls for nullification of the deficiency assessment.

■ Applying the rationale of Mangone to the present case, we hold that, despite the questionable nature of Revenue Agent Mortenson's conduct (the secretiveness of her intent and purpose regarding the 1955 records), the deficiency assessment must stand. For a variety of reasons, some of which were the responsibility of plaintiff, Revenue Agent Harlor, the agent who first examined plaintiff's 1955 records, did not actually learn of the existence of the quality-bonus system. Findings 16(b) and 43–45. On the other hand, Agent Mortenson's use of plaintiff's 1955 records was limited primarily to her inspection regarding the quality bonuses. In this sense, it cannot be said that plaintiff was subjected to "unnecessary examination."

208 F.Supp. at 127. Whether or not the decision in Leonardo was correct, the considerations which prompted that result are not applicable to the case at bar.

13. In M. O. Rife, Jr., supra, the majority of the Tax Court held that the taxpayers had waived their objection to the second examination. The majority stated, 41 T.C. at 747: "If a second examination is made with the knowledge of the taxpayer who raises no objection thereto, such taxpayer has waived the requirement of written notice even though respondent [the Commissioner] uses the information he obtains for a purpose not anticipated by such taxpayer at the time the second examination was made." Thus, Reineman, supra, and Leonardo, supra, were distinguished. However, a concurring opinion, joined in by five judges, went further and stated that: " * * * the failure of the Commissioner to comply with the provisions of section 7605(b) * * * does not invali-

date the deficiency determined. I would reach this decision with all due respect for, but notwithstanding the opinion of the Court of Appeals for the Seventh Circuit in Reineman v. United States * * * [supra], which stands alone in this field in the face of numerous judicial statements pointing the other way.

"In my opinion * * * nothing in the language of section 7605(b) or in the legislative history * * * requires a contrary holding. As this and other courts have repeatedly stated, that section of the statute (and its predecessors * * *) merely provides for the relief of a taxpayer from unnecessary and repeated examinations of his books and records such as he might otherwise be subjected to under the provisions of sections 7602, 7603, and 7604. [Citations omitted.]"

For a discussion of the legislative history of § 7605(b), see United States v. Powell, 379 U.S. 48, 54, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964).

Furthermore, without regard to plaintiff's subjective intent, plaintiff did voluntarily furnish to Agent Mortenson its 1955 records. Cf. M. O. Rife, Jr., supra, at 747.

Therefore, we conclude that, in this case, the failure of the Government to comply with section 7605(b) had no effect upon the validity of the deficiency assessment for fiscal 1955. As stated previously, we hold that the actions of the Commissioner of Internal Revenue with regard to plaintiff's deduction of quality bonuses constituted the proper exercise of discretion. Accordingly, plaintiff is not entitled to recover and the petition is dismissed.