**Howard M. REINEMAN and Helen Reineman, Plaintiffs-Appellees,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 13460.**

United States Court of Appeals Seventh Circuit.

April 6, 1962.

Louis F. Oberdorfer, Asst. Atty. Gen., Charles T. Duncan, Atty., Tax Div., Dept. of Justice, Washington, D. C., James P. O'Brien, U. S. Atty., Chicago, Ill., Lee A. Jackson, Joseph Kovner, Attys., Dept. of Justice, Washington, D. C., for appellant.

Eugene T. Devitt, Gerard R. Scheib, Scheib & Maher, Allan J. Newman, Chicago, Ill., for appellees.

Before HASTINGS, Chief Judge, and DUFFY and SWYGERT, Circuit Judges.

HASTINGS, Chief Judge.

This is an appeal by the Government from a judgment in the amount of $76,-052.60 with interest, entered in favor of plaintiffs[1] (taxpayers) in a suit for refund of overpayment of personal federal income tax for the year 1954.

The case was tried to the court without the intervention of a jury. The district court sustained taxpayers' claim that the entire cost of six thoroughbred brood mares over age ten purchased by taxpayers in November and December, 1954 for $102,608 was deductible in full in the year of purchase, as depreciation "of property used in the trade or business."[2]

---

1. Taxpayers Howard M. Reineman and Helen Reineman are husband and wife and filed a joint federal income tax return for the year 1954, the taxable year in question.

2. Int.Rev.Code of 1954 § 167(a), 26 U.S. C.A. § 167(a) provides: "(a) General rule.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (in-

The district court also sustained taxpayers' claim that the deficiency assessment which gave rise to the overpayment should be set aside because the Commissioner made a second inspection of taxpayers' books of account for the year 1954 without giving taxpayers prior written notice as required by Section 7605 (b), Internal Revenue Code of 1954.[3]

Brood mare sales are held each year in October, November and December. The breeding season runs from February 15 to June 15, and the gestation period for a foal is 340 days. The custom in the thoroughbred industry, recognized by the Government, is that all thoroughbreds have a birth date of January 1. One year is added to the age of each thoroughbred brood mare on January 1 of each year without regard to the month of birth.

Taxpayers started in the business of raising thoroughbred horses in 1942 with a small stable of race horses. Their operations grew until in 1948 they were in the business of breeding race horses on a large scale.

In 1954, taxpayers owned approximately one hundred brood mares, ranging in age from two to twenty years. In 1954, they purchased ten additional brood mares, ranging in age from six to twenty years. Seven of these brood mares were over age ten at the time of purchase.[4] They were placed in the herd with the other one hundred brood mares owned by taxpayers. During the years 1949 to 1953 inclusive, taxpayers had purchased twenty brood mares over age ten for a total cost of $150,416.67.

With respect to taxpayers' adoption of a ten year useful life for all horses in their stable, the district court found that:

"[P]laintiffs consulted and followed the only guide to depreciation of horses, Bulletin F, I.R.S. Publication No. 173. * * * The plaintiffs sought the advice of tax counsel and a Certified Public Accountant and were directed to the Carson Tables, published by the Commerce Clearing House, in the magazine Taxes, August 1948, * * * and a book 'Racing and Income Tax' published by the National Thoroughbred Foundation * * *. The plaintiffs, adopting the recommendations contained in all of these publications and relying on Government Bulletin F, and with the advice of their tax counsel, who had the benefit of the experience of others in the breeding business, consistently used the same rates for depreciation of horses through that period. Specifically; race horses—10 years; brood mares —10 years. * * *"

A ten year useful life was adopted for all horses regardless of productivity or of age at the time of acquisition. The six brood mares in question were over age ten when purchased in 1954 and taxpayers, applying a ten year useful life, deducted the entire cost on their 1954 income tax return. This followed a practice consistently used by taxpayers since 1942 and never before challenged by the Internal Revenue Service.

This deduction was disallowed by the Commissioner on the ground that the six

cluding a reasonable allowance for obsolescence)—
  "(1) of property used in the trade or business, or
  "(2) of property held for the production of income."

3. "No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional in-

spection is necessary." Int.Rev.Code of 1954, § 7605(b), 26 U.S.C.A. § 7605 (b).

4. One of the seven mares over age 10 at the time of purchase was Gulf Breeze, age 20. Taxpayers paid $10,000 for her on December 9, 1954 and claimed the full cost as depreciation in 1954. The Government does not contest the depreciation claimed on this mare. The remaining six mares over age 10 are concerned in this appeal. The aggregate cost of the six mares was $102,608.

mares in question had a probable useful life of sixteen to seventeen years, and further that since the mares were purchased in November and December, 1954, only two-twelfths or one-twelfth of the annual amount was deductible in that year.

We are faced with two issues in this appeal. The first relates to whether the entire cost of the six brood mares in question was properly deducted as depreciation in the year of purchase (1954) by taxpayers. The amount of depreciation allowable is not in dispute. It is agreed that taxpayers may deduct the full purchase price of the mares. It is merely a question of timing—when may the cost be properly claimed?

The second issue relates to the correctness of the finding and holding of the district court that the deficiency assessment must be set aside because the Commissioner made a second inspection of taxpayers' 1954 books of account without notifying taxpayers in writing as required by Section 7605(b), supra.

Since our resolution of the second issue is dispositive of this appeal, we first give it consideration. On this question, the district court entered the following findings of fact:

"2. The plaintiffs filed a timely joint Federal Income Tax Return (Form 1040) for the taxable year 1954 on or about March 11, 1955, with the District Director of Chicago, Illinois and paid the tax determined thereon; a copy of the Federal Income Tax Return, Form 1040, was introduced in evidence. (Plaintiffs' Exhibit 10).

"3. The Commissioner of Internal Revenue by his agent, Louis Locsmandy, caused the aforesaid return, and the books and the records reflecting depreciation taken on thoroughbred horses for the year 1954 to be examined on November 27, 1956, and as a result of said examination a deficiency was found in the amount of $2,091.14. Said deficiency being satisfied on March 20, 1957.

"4. During the month of August, 1957, the plaintiffs were notified by Harold Rogers, another agent of the Internal Revenue Service, that he was assigned to audit plaintiffs' 1955 books and records. Agent Rogers did not request an audit of plaintiffs' 1954 books and records.

"5. Plaintiffs first learned that their 1954 return had been reopened by Agent Rogers when they received in the mail plaintiffs' Exhibit 3, a ten-day letter.

"6. On October 4, 1957, plaintiffs protested a second examination of their 1954 books and records by letter to the Internal Revenue Service in Lexington, Kentucky (Plaintiffs' Exhibit 4).

"7. The plaintiffs did not consent to Agent Harold Rogers' inspection and examination. No re-examination was requested by the plaintiffs nor did the Secretary nor his delegate notify the plaintiffs in writing that an additional inspection was necessary. Agent Harold Rogers could not have prepared his detailed adjustments of all horses acquired in 1954 without an inspection and examination of plaintiffs' 1954 accounts and records. (Plaintiffs' Exhibit 2)."

Agent Rogers did not testify at the trial. The Government took his discovery deposition and introduced it at the trial. The burden of Rogers' testimony in his deposition is that, although he reopened the year 1954, he made no examination of taxpayers' books and records. He stated in effect that he got the information and data necessary to prepare his computation of allowable depreciation expenses for the year 1954 "from the taxpayer's accountant's work papers, for the year 1955 and subsequent years." These were made available to him by the accountant. The work papers were not produced at the trial.

The computation by Agent Rogers is shown as Plaintiff's Exhibit 2 and reads:

PLAINTIFF'S EXHIBIT 2

(U. S. Treasury Department—Internal Revenue Service)

(COMPUTATION OF ALLOWABLE DEPRECIATION EXPENSE)

Form 1914
Apr. 1954
Exhibit A

Howard M. & Helen S. Reineman     1954
* Kind of property
(If buildings, state type of construction. Exclude land and other non-depreciable property)

| Kind of Property | (Age) | Date Acquired | Cost or Other Basis | Depreciation Allowed Or Allowable In Prior Years | Remaining Cost Or Other Basis To Be Recovered | Life | | Depreciation Allowable This Year | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Used In Accumulating Depreciation | Estimated From Beginning Of Year | | |
| Bibijon | (13) | 11-1-54 | 5,000.00 | —0— | 5,000.00 | 17 Yrs. | 4 Yrs. | (2/12) | 208.33 |
| Monsoon | (13) | 12-2-54 | 44,100.00 | —0— | 44,100.00 | 17 | 4 | (1/12) | 918.75 |
| Linaria | (11) | 12-8-54 | 30,870.00 | —0— | 30,870.00 | 16 | 5 | (1/12) | 514.50 |
| Maintenon | (13) | 12-8-54 | 12,936.00 | —0— | 12,936.00 | 17 | 4 | (1/12) | 269.50 |
| Market Basket | (12) | 12-9-54 | 5,292.00 | —0— | 5,292.00 | 16 | 4 | (1/12) | 110.25 |
| Tilly's Last | (11) | 12-9-54 | 4,410.00 | —0— | 4,410.00 | 16 | 5 | (1/12) | 73.50 |
| Totals | | | 102,608.00 | | 102,608.00 | | | | 2,094.83 |

*Broodmares

Total Depreciation Expense Allowable    2,094.83
Depreciation Expense Claimed    102,608.00
Increase/(Decrease)    100,513.17

At the trial, Mr. Reineman testified as follows:

"By Mr. Devitt:

"Q. Now, Mr. Reineman, from your experience and your knowledge of your books and records, the filing of your 1954 return, would it be possible that Agent Rogers could have made the depreciation adjustments without the names and dates taken from your 1954 books of account?

\* \* \* \* \* \*

"The Witness: There is no way that it could have been done. It is inconceivable.

"By Mr. Devitt: Q. In other words, for Mr. Rogers to have prepared Plaintiff's Exhibit 2, recomputation of allowable depreciation for the six broodmares in question he would have had to examine—

"By the Witness: A. He had to reopen 1954 and examine the records.

"Q. He couldn't obtain that information from your 1954 return?

"A. It is not on there, sir."

Taxpayers' 1954 tax return was in evidence and the depreciation allowance claimed was shown in a two line table of composite figures without any detailed specification of the horses and mares involved.

Several inescapable inferences may be drawn. Agent Rogers could not have obtained his information from the 1954 tax return. The entire cost of the six brood mares was charged off in 1954. It is reasonable to conclude that the data as to these mares would not be necessary to the preparation of taxpayers' accountant's work papers for 1955 and subsequent years. Rogers had access to taxpayers' books of account for 1955 and subsequent years. He made no claim that he got the 1954 information from them. Rogers' deposition is lacking in specifics and the trial court was justified in crediting Reineman and rejecting Rogers.

The Government does not contend that the Commissioner complied with Section 7605(b). It first urges that the material findings on this issue are not supported by the record and are clearly erroneous. We do not agree. There was a conflict between taxpayer and Agent Rogers. The trial court resolved such conflict in favor of taxpayer. This was within the province of the hearing tribunal. National Labor Relations Board v. Aurora City Lines, Inc., 7 Cir., 299 F.2d 229 (1962). We hold that such findings are not clearly erroneous but are amply supported by the record. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

The Government finally contends that the district court erred as a matter of law in invalidating the deficiency assessment as a result of a found violation of Section 7605(b). It asserts that taxpayers' "remedy is one of self-help—he may refuse to permit the subsequent examination and oppose the director's application for a subpoena." The short answer to this is the taxpayers had no opportunity for self-help. Agent Rogers never made any pretense that his assignment was to reopen the year 1954 or to reaudit the books of account for that year. It is agreed that taxpayers' first knowledge that Agent Rogers was reopening 1954 was their receipt of the ten-day letter. Taxpayer was totally unaware of any re-examination, while it was in progress. Subsequent to receipt of the ten-day letter, following taxpayers' protest, they were advised by the Internal Revenue Service that a reexamination was not necessary.

There is no contention of fraud or any conscious action on the part of taxpayers to mislead anyone. It is conceded that taxpayers acted in good faith and that their claim of depreciation was fully consistent with the method used in prior years.

In support of its position, the Government cites Philip Mangone Co. v. United States, Ct.Cl., 54 F.2d 168 (1931); Executors of Estate of Barker v. Commissioner, 13 B.T.A. 562 (1928); McDonnell v. Commissioner, 6 B.T.A. 685 (1927). These three cases and others of

similar tenor[5] involve instances where taxpayers either failed to object or voluntarily consented to a re-examination. Under such circumstances, the courts have properly held that taxpayers have waived their rights under the statute.[6]

The question of the relief to be granted a taxpayer for a violation of Section 7605(b) with a resulting deficiency assessment appears to be essentially one of first impression. No case has been cited, and our research has revealed none, where a deficiency assessment under this situation has been either upheld or invalidated.

█ Under the facts of this case, taxpayers are left without any remedy to correct the illegal action taken by the Commissioner unless the deficiency assessment is set aside. We hold that the district court did not err in its conclusion of law to that effect.

In view of the foregoing, we do not reach and pass upon the question concerning the period in which the depreciation should be claimed.

The judgment of the district court awarding refund as entered below is affirmed.

Affirmed.

---

5. United States v. O'Connor, 2 Cir., 237 F. 2d 466 (1956); Glassell v. Commissioner of Internal Revenue, 5 Cir., 42 F.2d 653 (1930); Haun v. Commissioner, 13 B.T.A. 297 (1928).

6. See 8 Mertens, Federal Income Taxation § 47.48 (Zimet Rev. 1957).